E-FILED
Thursday, 29 October, 2015  02:31:37 PM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

CHRISTY GOODWIN,
     Plaintiff,

v.                              Case No. 2:13-cv-02076-JEH

PONTIAC COMMUNITY
CONSOLIDATED SCHOOL
DISTRICT NO. 429,
     Defendant.

## Order and Opinion

Now before the Court is the Defendant's Motion for Summary Judgment (Doc. 22).  The Motion is fully briefed and for the reasons set forth below, the Defendant's Motion for Summary Judgment is GRANTED.

## I

Cheryl Corrigan, the Special Education Director for the Defendant School District, was charged with hiring a psychologist for the School District in 2009. The School District posted an opening for the position and the Plaintiff was the only applicant.  Corrigan, together with other administrators, interviewed the Plaintiff.  During the interview process, the Plaintiff did not ask for any accommodations in the event of hiring due to Attention Deficit Hyperactivity Disorder (ADHD), which she had her whole life and was diagnosed with by Dr. John, her treating physician.  The Plaintiff also did not provide any documentation during the interview process that she had been diagnosed with ADHD.  The Plaintiff was recommended for employment, that was approved, and the Plaintiff was given an employment contract to commence August 17,

2009 and end the last day of the 2009-2010 school year. The Plaintiff knew the contract period was for one school year term, and she reported to Corrigan.

As non-tenured staff, the Plaintiff was evaluated two times per school year by Corrigan. Corrigan conducted the Plaintiff's first performance evaluation on October 29, 2009 by observing the Plaintiff, spending time with her, and then completing the evaluation form. The Plaintiff received an "excellent" rating. On February 26, 2010, the Plaintiff was evaluated again and received another "excellent" rating with no concerns reported other than that she needed to become better educated in the Response to Intervention (RTI) process. At no time during the 2009-2010 school year did Dr. John place any restrictions on the Plaintiff, nor did she request any ADHD accommodations. The School Board, with the authority to both renew and non-renew contracts, renewed the Plaintiff's employment as the school psychologist for the school year commencing August 16, 2010 and ending the last day of the 2010-2011 school year. The Plaintiff knew this contract was also for one school year term.

On November 17, 2010, the Plaintiff was evaluated and there were no concerns aside from professional development issues specifically related to the RTI process. Corrigan also told the Plaintiff that she had to increase her presence in the buildings and classrooms and make herself more available. The Plaintiff received some "excellent" ratings in that evaluation as well as a "satisfactory" rating. On February 16, 2011, the Plaintiff was again evaluated and Corrigan noted:

> Ms. Goodwin has had several issues this year regarding technology. The following guidelines need to be in place. Do not install anything or tamper with school computers or cell phones. Do not remove the district laptop from school grounds. Do not use personal laptop on school grounds. Do not access social or non-school related websites while at school.

2

Dft's MSJ, Exhibit H (Doc. 22-2 at pg. 171).    Concerns with the Plaintiff's performance that were noted by Corrigan in the February 2011 evaluation included absences from work, arriving to work on time, leaving work on time, responding to emails timely, checking her mailbox, and leaving messages if she was going to be absent and could not log into the system.   The Plaintiff received an overall "satisfactory" performance rating.    Though the Plaintiff had an opportunity to write a written response to her evaluation, she did not do so. During the 2010-2011 school year, Dr. John did not place any restrictions on the Plaintiff, and she did not request any ADHD accommodations.   No written disciplinary actions were taken against the Plaintiff by the Defendant in the Spring Semester of 2011 or over the summer of 2011.

The Plaintiff's contract as the school psychologist was renewed, and she was employed for one school year commencing August 15, 2011 and ending the last day of the 2011-2012 school year.   The Plaintiff knew this contract period was for one school year term.   Between August 16th and August 26, 2011, the Plaintiff told Corrigan that she was "depressed," although she did not tell Corrigan whether she had been diagnosed with depression or was just saying that she was depressed.   Dft's MSJ, Exhibit C (Doc. 22-1 at pg. 110).   In August 2011, during a closed session meeting[1] of the School Board, a document regarding the Plaintiff prepared by Corrigan was read to the Board.   Stacey Shrewsbury, a member of the School Board since 2007 and president since 2011, testified that issues with the Plaintiff's cell phone and laptop (adding and deleting programs) were noted. The August 2011 closed session School Board meeting was the first time the Board was made aware of issues regarding the Plaintiff's performance, and the document prepared by Corrigan was for information purposes.   In an August 26,

---

[1] A closed session was held when specific employees, performance, and compensation were discussed.

3

2011 memo drafted by Corrigan, "Review of Job Expectations and District Procedures," she noted previously discussed issues with Goodwin including that Goodwin was told not to remove the district assigned laptop from school, not to access social or non-school related websites on her laptop, not to bring in her personal laptop for school use, and not to tamper with her district issued cell phone.  The memo further addressed more concerns, including Goodwin's work hours and break times, organizational skills, and professional dress.  The memo listed the expectations for Goodwin and served as a written warning.  The August 26, 2011 memo was then discussed with the Plaintiff, and she did not recall having any discussions about ADHD or accommodations during that meeting.

On October 28, 2011, the Plaintiff was again evaluated, which Corrigan acknowledged was "not so good" of an evaluation.  The evaluation form used was used for the first time and only for the Plaintiff.  Corrigan had told the Plaintiff the previous year that Corrigan was going to do research and come up with an acceptable form that would work for the Plaintiff's position as school psychologist, as the evaluation form then used was designed for teachers.  The new evaluation form was reviewed by the Plaintiff and also by the Union before Corrigan used it in October 2011 for the Plaintiff's evaluation.  In that evaluation, ongoing problems were noted including the RTI process.  The Plaintiff refused to sign the evaluation.  On October 28, 2011, Corrigan drafted a memo regarding "Disciplinary Action" to the Plaintiff which provided that there were additional issues with the Plaintiff's use of her laptop and that she inexcusably failed to intervene in a crisis situation that arose with a student.  The memo further provided that in light of the identified infractions, the Plaintiff was being placed on a five-day unpaid suspension.

After the five-day suspension, the Plaintiff took additional time off from work per Dr. John's November 8, 2011 note which stated, "Chris is unable to work @ this time due to an exacerbation of her condition.  The earliest she could return to work would be Nov. 28th, 2011."  Dft's MSJ, Exhibit N (Doc. 22-2 at pg. 190).  Dr. John wrote another note dated November 14, 2011 in which he stated, only, "Chris may return to work as of 11/28/11 full time with ADHD Accommodations."  Dft's MSJ, Exhibit O (Doc. 22-2 at pg. 191).  That November 14th note was the first time that ADHD accommodations were mentioned, though the note did not include what those accommodations should be.

When the Plaintiff returned to work, Corrigan discussed Dr. John's note with Goodwin and asked her several times to provide Corrigan with Dr. John's recommendations for ADHD accommodations so that the School District would know what the accommodations should be.  The Plaintiff prepared a memo dated December 6, 2011 in which she listed 4 accommodations which were:

> 1) Two 10-15 minute breaks from work activity (1 in the morning, one in the afternoon).
> 2)  Use of electronic device and/or cell phone for organizational assistance.
> 3)  Employer assistance with weekly and/or daily task prioritization and goal setting.
> 4)  Weekly performance evaluations, based upon set priorities/goals (as defined by #3).

Dft's MSJ, Exhibit P (Doc. 22-2 at pg. 192).  The memo noted that Corrigan verbally approved the four accommodations.  The Plaintiff emailed the memo to Corrigan, but the Plaintiff did not recall when she sent it.  Corrigan recalled that she received Goodwin's memo prior to receiving a doctor's note as to what the ADHD accommodations were to be.

Another closed session of the School Board occurred on December 15, 2011, and the Plaintiff was again discussed.  During that session, the School

Board was informed of the Plaintiff's continued performance issues including that her laptop was to be kept at school, that she was not to tamper with her cell phone, that she was not prepared for meetings, that she was not meeting the responsibilities of her job, that she was suspended for five days for not following directives, that she thereafter took time off, and that when the Plaintiff returned to work in November she made a request for accommodations to Corrigan. The Plaintiff did not return to work on December 16, 2011 which was the last day before the Christmas break, and the Christmas break then went from December 19, 2011 through January 2, 2012.

Dr. John wrote a note dated December 21, 2011 "To Whom It May Concern" listing four ADHD accommodations "due to ADHD and anxiety symptoms" which Corrigan did not see until she returned back to school from the break on January 3, 2012. Dr. John detailed those four accommodations which were identical to those detailed by the Plaintiff herself in the memo she gave to Corrigan earlier in December 2011:

> 1)  Two 10-15 minute breaks from work activity (1 in the morning and One [sic] in the afternoon)
> 2)  Use of electronic device and/or cell phone for organizational assistance.
> 3)  Employer assistance with weekly and/or daily task prioritization and goal setting.
> 4)  Weekly performance evaluations, based upon set priorities/goals (as defined by #3)

Dft's MSJ, Exhibit Q (Doc. 22-2 at pg. 193). The Plaintiff returned to work on January 3, 2012 as well. Corrigan wrote a memo dated January 4, 2012 regarding "Documentation of Verbal Warnings" which documented that she and Goodwin were meeting that day for her to issue Goodwin a verbal warning for failing to complete work accurately and for using her personal cell phone during work hours for personal calls. The meeting was held on January 4, 2012 regarding the

6

infractions that were observed before the Christmas break.  After the meeting, the Plaintiff had medical issues, an ambulance was called, and she was transported to the hospital.  The nurse Narrative Note stated, among other things, that the Plaintiff was complaining of a migraine and that she felt dizzy/weak.  The Plaintiff never returned to the School District after January 4, 2012.

Dr. John wrote a note dated January 9, 2012 which stated that the Plaintiff required 6 weeks of medical leave beginning January 4, 2012 due to an exacerbation of her psychiatric condition.  The Plaintiff then wrote a note dated February 12, 2012 applying for TRS Disability.  On March 12, 2012, a "Resolution Reference [sic] The Dismissal of Chris Goodwin" was adopted by the School Board; the School Board took the action to not renew the Plaintiff's contract for the following school year.  On March 13, 2012, a letter was sent to the Plaintiff enclosing the Resolution, advising that her employment would not be renewed, and that her employment would terminate as of the last scheduled work day for the 2011-2012 school year.  She received that letter.

On April 11, 2013, the Plaintiff filed the instant lawsuit against the Defendant Pontiac Community Consolidated School District No. 429 (School District).  On September 17, 2013, the Plaintiff filed her First Amended Complaint (Doc. 9) pursuing two counts against the Defendant including:  1) a violation of the Americans with Disabilities Act (ADA); and 2) state law breach of contract. The Plaintiff specifically alleged:

> That by the conduct described [in the First Amended Complaint], the Defendant has willfully and intentionally, with malice or reckless disregard of the Plaintiff's rights as an employee, engaged in unlawful and discriminatory employment practices in treating the Plaintiff with different terms and conditions as other similarly situated employees, including but not limited to denying her reasonable accommodations; denying her medical leave; and

7

ultimately terminating her on May 24th, 2012 for false and pre-textual reasons, in violation of the ADA."

Plaintiff's First Amended Complaint, ¶ 18 (Doc. 9 at pg. 4).  She also specifically alleged that "the Defendant breached the contract and its duty of good faith and fair dealing there under in its decision not to re-new Plaintiff's contract."  Plf's First Amended Complaint, ¶ 27 (Doc. 9 at pg. 6).

## II

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A movant may show the absence of material fact by citing to admissible evidence in the record or by showing that the nonmovant "cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1)(A), (B).  The party opposing summary judgment must not merely rest upon the allegations of his complaint but must instead also point to admissible evidence in the record to show that a material fact is genuinely disputed.  *Id*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (explaining that the plaintiff must "present affirmative evidence in order to defeat a properly supported motion for summary judgment").

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor.  *Id*. at 248.  There is a genuine dispute of material fact only where there is sufficient evidence favoring the nonmoving party that would permit a jury to return a verdict in the nonmoving party's favor.  *Brummet v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### III

### A

The ADA provides, in relevant part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  "Discrimination" as used in the ADA encompasses two distinct types of discrimination:   1) treating a qualified individual with a disability differently because of the disability, i.e., disparate treatment; and 2) failing to provide reasonable accommodation.  *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997).  A disparate treatment discrimination claim under the ADA may, in turn, be proved either directly or indirectly.  *Id*. at 1022.

Here, the Plaintiff ostensibly argues both disparate treatment and failure to provide reasonable accommodation as the bases for the Defendant's alleged violations of the ADA.

### B

The Defendant argues in regard to the Plaintiff's failure to accommodate claim that it did exactly what was required of it under the ADA.  A plaintiff alleging a failure-to-accommodate claim under the ADA must establish the following elements:   1) the plaintiff must be a qualified individual with a disability; 2) the employer must be aware of the plaintiff's disability; and 3) the employer must have failed to reasonably accommodate the disability.  *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013); *see also* 42 U.S.C. § 12112(b)(5)(A) (providing that the employer engages in unlawful disability

discrimination when it fails to provide reasonable accommodations for "the known physical or mental limitations of an otherwise qualified individual").

In the context of reasonable accommodation for the Plaintiff's ADHD, the parties do not directly address the first necessary element which indicates no dispute that it is established. The parties do dispute the second element which is the Defendant's knowledge (or lack thereof) of the Plaintiff's ADHD at the time Goodwin was interviewed for the school psychologist position in 2009. The Defendant argues that regardless of the interviewers' knowledge of the Plaintiff's ADHD at the time of her interview, Goodwin did not make any request for ADHD accommodations at the time of her interview, that no request for ADHD accommodations were made during the course of the 2009-2010 and 2010-2011 school years, and that no work restrictions were given to Goodwin by Dr. John during the course of the 2009-2010 and 2010-2011 school years. The Defendant further argues that the first time a request for ADHD accommodations was made on November 14, 2011 via the note from Dr. John, the School District made reasonable efforts to communicate with the Plaintiff and to provide accommodations as requested. The Plaintiff argues that there is a material issue of fact as to whether Pontiac administrators and her immediate supervisor knew about her disabilities, and whether the School District could have accommodated her "repeated requests." Thus, the parties also dispute the third element - that the Defendant failed to accommodate Goodwin's disability. Even after viewing the evidence in the light most favorable to the Plaintiff by assuming that the Defendant was made aware of the Plaintiff's ADHD and anxiety as early as her interview, the evidence does not display a material question of fact as to the Defendant's efforts to reasonably accommodate Goodwin's ADHD. A plaintiff must normally request an accommodation before liability under the ADA attaches. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013), *quoting*

*Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012). "The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort." *Id.* (internal quotations omitted). A close reading of the Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment reveals that the Plaintiff does not point to any evidence which raises a material question of whether the Defendant failed to fulfill its duty of reasonable accommodation.

First, it is of note that the Plaintiff repeatedly responded in her deposition that she could not remember discussions regarding ADHD accommodations in August 2011 or in October 2011, or when the "prescription pad note" from Dr. John with the four listed accommodations was tendered to the Defendant. Dft's MSJ, Exhibit E (Doc. 22-2 at pgs. 45-46, 48). More importantly, the uncontroverted evidence establishes that once the Defendant was made aware of the Plaintiff's ADHD and the need for ADHD accommodations via the November 14, 2011 note from Dr. John, Corrigan promptly discussed Dr. John's note with the Plaintiff and asked her several times to provide Corrigan with Dr. John's recommendations for ADHD accommodations. The evidence also shows that upon presenting Corrigan with four accommodations in December 2011, Corrigan discussed them with Goodwin and verbally approved them. Dft's MSJ, Exhibit P (Doc. 22-2 at pg. 192). Furthermore, the undisputed evidence shows that the November 14, 2011 note was received while Goodwin was on leave, and that from the time of her return to work on November 28, 2011 to Goodwin's last day of attendance before the Christmas break (just 14 working days), the Defendant communicated with the Plaintiff to work towards implementing her accommodation requests.

Again, even after viewing the evidence of the Defendant's accommodation efforts in the light most favorable to the Plaintiff, the Defendant is entitled to

summary judgment on the Plaintiff's reasonable accommodation ADA claim. The Plaintiff returned to work after the Christmas break for just one day, January 4, 2012. Thus, as the Defendant argues, there was no ongoing opportunity to provide the Plaintiff with the ADHD accommodations she requested, as she was not present at work to accommodate her. In fact, the Plaintiff cannot show a material factual dispute exists regarding the question of whether the Defendant provided reasonable accommodation given that she was not at work to be provided or denied such accommodation. When Goodwin left for Christmas break, the parties were still in the process of implementing the accommodations. As a result, the Plaintiff's testimony that she was informed, after the December 15, 2011 School Board closed session meeting, by Corrigan and Steve Graham (the superintendent) that accommodation requests 3 and 4 could not be provided does not present a genuine dispute as to a material fact; the Plaintiff was not at work on December 16, 2011 (the day after the School Board meeting), she was on Christmas break until January 3, 2012, and the following day was the last day she was at work for the 2011-2012 school year.

## C

As for the Plaintiff's disparate treatment claim, the Defendant argues that the Plaintiff has not made the showing that the decision to non-renew her contract for the 2012-2013 school year term was motivated by animus based on the Plaintiff's disability or request for accommodation. The Defendant points to evidence of the Plaintiff's performance issues as early as February 2011 in her evaluation continuing through the August 2011 memo, the October 2011 memo, and the October 2011 evaluation which all pre-dated Corrigan's receipt of any medical, psychological, or psychiatric reports or information from any medical provider from the Plaintiff. The Plaintiff argues that from August 2011 until January 2012 there are a myriad of factual issues, as identified by the Plaintiff,

12

that serve as the bases for finding violations of the ADA.  In particular, the Plaintiff argues that there is evidence that:  beginning in August of 2011 direct animus was displayed toward her immediately after the administration was made aware of her medical condition and her requests for accommodation; in October 2011 she was treated differently than any other employees and lastly; when she requested accommodations and she provided the School District with her physician's report requesting those accommodations she was confronted and disciplined with 24 hours which eventually led to her termination.

Though it is not entirely clear due to the lack of citation to case law in framing her arguments, it appears that the Plaintiff is arguing disparate treatment under the direct method.  In order to survive summary judgment using the "direct method," a plaintiff must show that a genuine issue of material fact exists with respect to the following:  1) that the plaintiff is disabled within the meaning of the ADA; 2) that the plaintiff is qualified to perform the essential functions of the job with or without accommodation; and 3) that the plaintiff has suffered an adverse employment action because of her disability.  *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014).  Proving the third element can be done with either direct or circumstantial evidence, the latter of which may include:  1) suspicious timing; 2) ambiguous statements or behavior towards other employees in the protected group; 3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and 4) evidence that the employer offered a pretextual reason for an adverse employment action.  *Id.* at 683-84.

Here, the Defendant concedes the second element of the direct method analysis by failing to present any argument on that element.  As for the first element, the Defendant argues that Corrigan testified that she did not know if the "depression" the Plaintiff testified to was actually diagnosed or whether the

Plaintiff was just saying she was depressed, and that there is no doctor's note diagnosing the Plaintiff with depression.  The Plaintiff makes much ado about the conversation she had with Corrigan during which she told Corrigan she was depressed.  However, the Plaintiff does not point to any evidence in the record which establishes, nor does she argue in such a way to show, that her "depression" was a disability as that term is defined in the ADA.  The ADA defines disability as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).

Here, the Plaintiff has presented no evidence or argument whatsoever that her "depression" limited one or more major life activities, has provided no record of such an impairment, and has provided no evidence that she was regarded as having such an impairment. Instead, the undisputed record evidence is that Corrigan was unsure of whether the Plaintiff was saying she had been diagnosed with depression, or whether she was just saying that she was depressed.  The evidence of record pertaining to the Plaintiff's statements, without more, about being "depressed" are insufficient to create a genuine issue of material fact with respect to the question of whether she was disabled within the meaning of the ADA.  The Plaintiff's cited case, *MacEntee v. IBM*, 783 F. Supp. 2d 434, 443 (S.D.N.Y. 2011), regarding depression as a disability for purposes of the ADA does not render the evidence she points to sufficient to create a genuine issue of material fact.  *MacEntee* explained that, "Depression may qualify as a disability for purposes of the ADA, provided that the condition is not a 'temporary psychological impairment,' and the condition substantially limits a

14

major life activity."  *Id.* (internal quotations and citations omitted).  *MacEntee* supports the conclusion in *this* case that the Plaintiff has not pointed to evidence sufficient to create a genuine dispute because the evidence she cites does not provide that her "depression" was more than a temporary psychological impairment, and it does not show that her "depression" substantially limited a major life activity.

In regard to the third element of the direct method analysis, the Defendant argues that the Plaintiff was non-renewed because of her performance and the unsatisfactory evaluation she received.  The Plaintiff counters that she was "fired" because she was depressed; because she had ADHD and had anxiety; because the School District did not want to deal with her; because her supervisor and principal thought she was acting strangely; and because she was a bother.

The undisputed evidence shows that the Plaintiff received some excellent ratings on her evaluations during the 2009-2010 and 2010-2011 school years, but she also received some satisfactory ratings during those school years as well in professional development.  Goodwin's very first and subsequent evaluations noted that she needed to be more educated in the RTI process.  In her February 2011 evaluation, she received satisfactory and unsatisfactory ratings and various concerns were noted including:  her arriving late to work and leaving early from work; her not responding to emails in a timely manner; her checking her mailbox to ensure that she was getting important communications; her increasing her presence in classrooms and buildings; and her misuse of the technology that was provided to her including a cell phone and work laptop.

A material issue is not created with the Plaintiff's assertions that Corrigan never read the February 2011 evaluation to the Plaintiff or that Corrigan did not have direct knowledge of the issues she reported in the evaluation regarding the Plaintiff's use of technology.  The Plaintiff clearly signed the February 2011

evaluation in March 2011 which, at the very least, indicates she was provided the opportunity to read the evaluation.  Further, while the document created by the School District's IT person, Mike McCabe, regarding the Plaintiff's technology issues is itself hearsay, Corrigan's knowledge of those issues as reported to her by McCabe does not amount to hearsay.  *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004) (finding that statements in an affidavit about an individual's conversation with a third party regarding the plaintiff was not hearsay because not offered to prove the truth of the matter asserted but rather was offered to show the individual's state of mind at the time she was evaluating the plaintiff's performance).

The August 26, 2011 memo from Corrigan to Goodwin explicitly stated, "We are meeting today to discuss some issues that have been ongoing with Chris Goodwin, our school psychologist, *within the past year*."  Dft's MSJ, Exhibit K (Doc. 22-2 at pgs. 182-83) (emphasis added).  The memo went on to detail what Goodwin had been *previously* told was expected of her when she used her school laptop, personal laptop, and a district issued cell phone.  *Id*.  The Plaintiff argues that the timing of the August memo exhibits a direct animus toward her for bringing her concerns to Corrigan about her own mental health.  However, that argument loses its force in light of the fact that issues raised about the Plaintiff's conduct at work were merely a continuation of the issues raised by the School District previously.   The issues raised were those raised *before* the Plaintiff brought concerns about her own mental health to Corrigan's attention.  Moreover, Goodwin's argument loses its force in light of the Plaintiff's failure to raise a material issue as to whether her "depression" was a disability as defined in the ADA and as discussed above.  Goodwin offers no evidence of record to support her "direct animus" argument regarding the August memo, whereas the Defendant cites to record evidence consisting of Corrigan's testimony that

16

Goodwin continued to do things within the first 10 days of the 2011-2012 school year that she was told not to do the previous school year.  Dft's MSJ, Exhibit C (Doc. 22-1 at pgs. 95-97).

While the Plaintiff's October 2011 evaluation was done on a form different from that used for other staff, the Defendant points to uncontroverted evidence that provides an explanation for why the different form was used.  The evidence includes Corrigan's testimony where she explained that the previous form was designed for teachers, not a school psychologist.  Corrigan further testified that she and Goodwin discussed how she would come up with an acceptable form that would work for Goodwin's position.  Lastly, Corrigan testified that the new evaluation form was first reviewed by Goodwin and the Union before it was put to use.  Dft's MSJ, Exhibit C (Doc. 22-1 at pgs. 36, 37, 108, 109, 111).  The Plaintiff offers no evidence to contradict the reasons set forth by the Defendant for why a different form was used to evaluate the Plaintiff in October 2011.  Additionally, October 2011 was just one instance of the Defendant using a different form while the same form was used for the Plaintiff in the previous years.  Such evidence does not create a genuine dispute that similarly situated employees outside of the protected group *systematically* received better treatment.

Next, The Plaintiff does not dispute that she was then placed on a five-day suspension in October 2011.  She disputes the reasons stated by the Defendant for that suspension – continued violations with the use of her laptop and the failure to intervene in a crisis situation with a student –and instead argues that the basis for the suspension was pre-textual.  The Plaintiff points to one isolated piece of evidence – a portion of Corrigan's testimony – which provides that the School District's tech person, Mike McCabe, found nothing wrong with the Plaintiff's school computer and that there was no evidence of any tampering or improper activity.  The Plaintiff, however, presents a distorted view of that

evidence. The entirety of Corrigan's deposition testimony in that regard was that the Plaintiff herself was concerned that someone had installed some kind of spyware on her computer and so Corrigan and others met to discuss the Plaintiff's concerns and had McCabe take a look at Goodwin's laptop and cell phone, as well as to make sure that Goodwin understood what the expectations were regarding the use of her computer. Dft's MSJ, Exhibit C (Doc. 22-1 at pgs. 85-86). Corrigan further testified that while McCabe did not find any tampering over which the Plaintiff expressed concern, he did find that sharing permission had been allowed on the Plaintiff's computer and she was using MSN Messenger which she had previously been told not to use. (Doc. 22-1 at pg. 90). Ultimately, the Plaintiff cites to no evidence showing that she did not commit the infractions which led to her suspension, and specifically, she does not cite to any evidence which creates a genuine dispute of whether she in fact committed the technology violations that she was repeatedly warned about.

Finally, the Plaintiff argues that there is evidence of suspicious timing in that she was confronted with additional disciplinary infractions just 24 hours after Corrigan received the request from the Plaintiff's physician for accommodations on January 3, 2012. The Plaintiff has otherwise failed to show a genuine dispute over any of the other evidence she cites in support of her disparate treatment claim, and "suspicious timing alone is almost never enough to satisfy the causation prong of a plaintiff's burden at summary judgment." *Reynolds v. Champaign Urbana Mass Transit Dist.*, 378 F. App'x 579, 582 (7th Cir. 2010). The evidence of suspicious timing in this case is not enough. Though the evidence shows that a meeting was held with the Plaintiff on January 4, 2012 to discuss disciplinary issues, the Defendant introduced abundant evidence showing that it had already been made aware of the Plaintiff's ADHD before January 3, 2012. In particular, the evidence shows that: the Defendant had

already started the process of accommodating the Plaintiff's ADHD requests; the issues raised on January 4th were issues that persisted with the Plaintiff's performance from before the Christmas break (and even before that time); and the decision to non-renew the Plaintiff for the 2012-2013 school year was not made until March 2012.

Even assuming for purposes of summary judgment that the Plaintiff attempts to defeat summary judgment using the indirect method, she fails. The *prima facie* case under the indirect method requires a showing that similarly situated employees were treated more favorably. The Plaintiff utterly fails to identify any such employees. *See Bunn*, 753 F.3d at 685 (rejecting the plaintiff's argument under the indirect method where he did not fulfill his responsibility to identify a satisfactory comparator to the court). In the end, the Defendant is entitled to summary judgment on the Plaintiff's disparate treatment claim under the ADA.

## IV

The Plaintiff does not make any argument in response to the Defendant's Motion for Summary Judgment as to Count II of the First Amended Complaint for state law breach of contract. Therefore, such failure to offer any opposition amounts to a waiver of any argument in opposition. *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007), citing *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001). Nevertheless, "entry of a summary judgment motions as unopposed does not automatically give rise to a grant of summary judgment. Instead, the district court is still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate." *Pike v. Nick's English Hut, Inc.*, 937 F. Supp. 2d 956, 959 (S.D. Ind. 2013), *quoting Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 25 (1st Cir. 2006) (internal quotations omitted).

19

To establish a breach of contract under Illinois law, the plaintiff must show:  1) the existence of a valid and enforceable agreement; 2) performance by the plaintiff; 3) breach of the agreement by the defendant; and 4) a resulting injury to the plaintiff.  *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001), *citing Hickox v. Bell*, 552 N.E.2d 1133, 1143 (Ill. App. 1990).

Here, the Defendant argues that the plain and ordinary meaning of each of the three separate employment contracts ran for a period of one school year term and that the Plaintiff acknowledged that the period of each employment contract was for one school year term.  The Defendant highlights the evidence consisting of Stacy Shrewbury's deposition testimony wherein she explained that the Plaintiff's employment was not renewed with the School District based upon her performance and unsatisfactory evaluation.  The Defendant also points to the March 2012 letter informing the Plaintiff that her last day employed would be the last scheduled day for the 2011-2012 school year which was the date her one year term was to end according to the contract she entered into for the 2011-2012 school year term.  Thus, the Defendant argues that it fulfilled its obligations under the contract, and there was no breach.

The Defendant is entitled to summary judgment on the Plaintiff's breach of contract claim.  The undisputed evidence shows that the Plaintiff was repeatedly warned about her use of technology, had evaluations that went from excellent to satisfactory to unsatisfactory in some instances, failed to intervene in a crisis situation involving a student, was suspended for a five-day period due to infractions, and had various other issues that were noted as concerns during evaluations and in memos.  In other words, the evidence does not show a genuine dispute as to whether the Plaintiff performed the duties of her contract.  Nor is there any evidence that the Defendant breached the contract.  The Defendant provided the Plaintiff written notice that her employment with the

School District would terminate as of her last scheduled work day for the 2011-2012 school year which is just what the terms of her contract stated.   The Defendant did not breach the contract; it simply did not renew the Plaintiff's employment. Finally, there is no evidence of damages the Plaintiff actually sustained as a result the Defendant's alleged breach, let alone any evidence that would permit computation of those damages.  *See TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 632 (7th Cir. 2007), *citing Ellens v. Chicago Area Office Fed. Credit Union*, 576 N.E.2d 263, 267 (Ill. App. 1991) (explaining that the plaintiff's burden is not only to establish that he sustained damages, but that he must also establish a reasonable basis for computations of those damages).

### V

Based upon the foregoing, the Defendant's Motion for Summary Judgment (Doc.  22) is GRANTED.  This case is now terminated.

*It is so ordered.*

Entered on October 29, 2015.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE

21